The Fox Law Corporation
Steven R. Fox, CBN 138808
17835 Ventura Blvd., Suite 306
Encino, CA 91316
(818) 774-3545 ph. (818) 774-3707 fx.
srfox@foxlaw.com

Attorney for Jonathan Mover, Plan Proponent

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

In re:
SWING HOUSE REHEARSAL AND
RECORDING, INC.,

    Debtor and Debtor in Possession,

In re:
PHILIP JOSEPH JAURIGUI,

    Debtor and Debtor in Possession.

☐ Affects Both Debtors.

☒ Affects Swing House Rehearsal And
Recording, Inc. Only.

☐ Affects Philip Joseph Jaurigui Only.

Lead Case No.: 2:16-bk-24758-RK
Jointly administered with:
Case No. 2:16-bk-24760-RK

Chapter 11 Cases

**Fourth Amended Chapter 11 Plan of
Reorganization Dated April 16, 2018**

**TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................1

II.   CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ..............2

      A.    General Overview ......................................................................2

      B.    Unclassified Claims....................................................................2

            1.    Administrative Expenses.....................................................2

            2.    Priority Tax Claims............................................................4

      C.    Classified Claims and Interest.....................................................4

            1.    Classes of Secured Claims...................................................4

            2.    Classes of Priority Unsecured Claims .....................................7

            3.    Classes of General Unsecured Claims .....................................7

            4.    Class of Interest Holders ...................................................13

      D.    Means of Effectuating the Plan and Implementation of the Plan...........13

            1.    Funding for the Plan .......................................................13

            2.    Composition of the Reorganized Debtor ...............................14

            3.    Settlement ...........................    ...............................15

                  (a)    Litigation Claims Settlement

                  (b)    Potential Insurance Claims

            4.    Post-Confirmation Management .........................................16

            5.    Disbursing Agent............................................................17

            6.    Objections to Claims........................................................17

            7.    Avoidance and Non-Avoidance Actions................................18

            8.    Employment of Officers, Employees and Professionals ............19

            9.    Exemption from Transfer Taxes .........................................19

            10.   Employment of Professionals by the Reorganized Debtor
                  and Payment of Professional Fees and Expenses Incurred
                  after the Plan Effective Date ...............................................19

            11.   Distributions to be Made Pursuant to the Plan .......................20

            12.   Injunctions ...................................................................20

i

13.  Executory Contracts and Unexpired Leases ........................................... 21

14.  Changes in Rates Subject to Regulatory Commission Approval ................................................................................................... 22

15.  Default Provisions ..................................................................................... 22

16.  Retention of Jurisdiction ........................................................................... 22
17.  Turnover of Estate Assets t othe Debtor and Reorganized Debtor ..24
18.  Final Accounting ............................................................................... 25

III.  EFFECT OF CONFIRMATION OF THE PLAN ........................................ 25

A.  Discharge .......................................................................................... 25

B.  Modification of the Plan ................................................................. 25

C.  Post-Confirmation Status Reports ................................................. 25

D.  Post-Confirmation Conversion/Dismissal ................................... 26

E.  Final Decree ...................................................................................... 26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.    **INTRODUCTION**

Swing House Rehearsal and Recording. Inc. is the debtor and debtor in possession (the "Debtor") in the above-referenced lead Chapter 11 bankruptcy case.[1]  On November 8, 2016 (the "Petition Date"), the Debtor commenced this bankruptcy case by filing a voluntary petition under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). This document is the Fourth Amended Plan of Reorganization (the "Plan") that is being proposed by Jonathan Mover ("Mover," the "Plan Proponent"). The Original and First through Third Amended Plans were jointly proposed by the Debtor and the Plan Proponent. The Debtor has obtained Court approval of a disclosure statement (the "Disclosure Statement") which describes the Plan and on which this Plan relies. This Plan also relies on a supplement to the Disclosure Statement which has been served on creditors.

Chapter 11 allows the Debtor, and, under some circumstances, creditors and other parties in interest, to propose a plan of reorganization. This Plan is a plan of reorganization which will be proposed by the Debtor and Mover and is described herein. The effective date of the Plan (the "Plan Effective Date" or "Effective Date") occurs on the first business day that follows the first court day that is at least fourteen days following the date of entry of the Court order confirming the Plan (the "Plan Confirmation Order"), unless the Debtor in its sole and absolute discretion elects to cause the Plan to become effective earlier, provided that there is no stay in effect with respect to the Court order confirming the Plan (the "Plan Confirmation Order") This Plan refers to the Debtor as it exists after Plan Effective Date as the "Reorganized Debtor." **This document that you are reading is the Plan.**

---

[1] This chapter 11 case is jointly administered with the chapter 11 case of Philip J. Jaurigui, the President and Secretary of Swing House. Mr. Jaurigui has not filed a chapter 11 plan. This Plan pertains to Swing House only.

## II.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### A.    General Overview

As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority.  The Plan states whether each class of claims or interests is impaired or unimpaired.  The Plan provides the treatment each class will receive.

### B.    Unclassified Claims

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  As such, the Debtor has not placed the following claims in a class.

#### 1.    Administrative Expenses

Administrative expenses are claims for costs or expenses of administering the Debtor's Chapter 11 case which are allowed under Bankruptcy Code § 507(a)(2).  The Bankruptcy Code requires that all administrative claims be paid on the Plan Effective Date unless a particular claimant agrees to a different treatment.  The following chart lists all of the Debtor's § 507(a)(2) administrative claims and their treatment under the Plan.

| NAME | AMOUNT OWED | TREATMENT |
|---|---|---|
| Clerk's Office Fees | $500 (est.) | Paid in full on the Plan Effective Date. |
| Office of the United States Trustee ("OUST") | $4,875 or less | Paid in full on the Plan Effective Date |
| Levene, Neale, Bender, Yoo & Brill L.L.P. ("LNBYB"), bankruptcy counsel to the Debtor | $500,000 (est.) | Paid in full on the later of the Plan Effective Date and the date the Court enters an order allowing such fees and expenses or later if both parties agree to a deferred payment plan. |
| Friedman, Kannenberg & Company, P.C. (FK&Co), accountants for the Debtor | $25,000 (est.) | Paid in full on the later of the Plan Effective Date and the date the Court enters an order allowing such fees and expenses or later if both parties agree to a deferred payment plan. |
| Liner Law Group, special employment counsel for the Debtor | $5,000 (est.) | Paid in full on the later of the Plan Effective Date and the date the Court enters an |

|  |  | order allowing such fees and expenses or later if both parties agree to a deferred payment plan. |
| DLA Piper LLP (US), successor in interest to Liner LLP, former special real estate and employment counsel to the Debtor | $42,573.51 | Paid in full on the later of the Plan Effective Date and the date the Court enters an order allowing such fees and expenses or later if both parties agree to a deferred payment plan. |
| **TOTAL** | **$577,948.51 (est.)** | **Paid in the manner described above.** |

Court Approval of Fees Required:

The Court must approve all professional fees and expenses listed in this chart before they may be paid. For all professional fees and expenses except fees owing to the Clerk of the Bankruptcy Court and fees owing to the OUST, the professional in question must file and serve a properly noticed fee application and the Court must rule on the application. Only the amount of fees and expenses allowed by the Court will be required to be paid under the Plan. The administrative claim amounts set forth above simply represent the Debtor's best estimates as to the amount of allowed administrative claims in this case. The actual administrative claims may be higher or lower. The actual amount of administrative claims described above for professionals will be dependent upon whether the Debtor is required to engage in substantial litigation regarding the confirmation of the Plan and/or objecting to claims. By voting to accept the Plan, creditors are not acknowledging the validity of, or consenting to the amount of, any of these administrative claims, and creditors are not waiving any of their rights to object to the allowance of any of these administrative claims. Similarly, professionals who have been employed in this case are not being deemed to have agreed that the figures contained herein represent any ceiling on the amount of fees and expenses that they have incurred or are entitled to seek to be paid pursuant to Court order as such fees and expenses are just estimates provided at the time of the preparation of this Plan.

To the extent administrative claims are allowed before the Plan Effective Date, the allowed administrative claims may be paid by the Debtor out of the Debtor's funds. To the extent

allowed administrative claims are allowed after the Plan Effective Date, the allowed administrative claims will be paid by the Reorganized Debtor out of its operating funds.

### 2. Priority Tax Claims

Priority tax claims include certain unsecured income, employment and other taxes described by § 507(a)(8) of the Bankruptcy Code. Section 1129(a)(9)(C) of the Bankruptcy Code requires that each holder of a § 507(a)(8) priority tax claim receive regular installment payments of a total value, as of the Plan Effective Date, equal to the allowed amount of the allowed tax claims, over a period ending not later than five years after the Petition Date. The chart below indicates all priority tax claims which were either scheduled by the Debtor or asserted by the taxing agencies in filed proofs of claim.

| CLAIMANT | AMOUNT | TREATMENT |
|---|---|---|
| Franchise Tax Board (the "FTB") | $623.82 (Claim No. 2) | Allowed priority tax claim of the FTB to be satisfied and paid in full on the Effective Date in full and complete satisfaction of all FTB's priority unsecured claims herein. |
| California Employment Development Department (the "EDD") | $175.18 (Claim No. 4) | Allowed priority tax claim of the EDD to be satisfied and paid in full on the Effective Date in full and complete satisfaction of all EDD's priority unsecured claims herein. |
| TOTAL | $ 799.00 | Paid in the manner described above. |

### C. Classified Claims and Interest

### 1. Classes of Secured Claims

Secured claims are claims secured by liens against property of the estate. The following chart sets forth the description and treatment of each of the Debtor's secured claims:

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 1 | **Claimant:** Jonathan Mover<br><br>**Proof of Claim Amount:** $165,951.80 (Claim No. 7)<br><br>**Class 1 Plan Treatment:** Allowed | Y | Impaired; allowed claim in this class is entitled to vote on the Plan. | The plan deems $165,951.80 of this claim as an Allowed Secured Claim secured by the existing second-position lien.<br><br>Subject to applicable provisions of Class 6, starting on the month after the Plan Effective Date, the Plan Debtor shall make monthly payments of $1,146.03 on account of |

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| | $165,951.80 Secured Claim | | | this claim until the balance of the Allowed Class 1 claim is paid in full. The Allowed Secured Claim will be paid over a fifteen-year period at an interest rate of 3%.<br><br>Unless applicable holder(s) of the Class 1 Claim agree otherwise, there shall be no discount and no prepayment penalty for any early payment of the Class 1 Claim.<br><br>Monthly payments shall be due on the last day of each month. The lien shall remain until the Secured Claim has been paid in full as set forth herein and, upon such payment, shall be extinguished in its entirety and the holder of the Class 1 Claim shall immediately release its lien. In the event that Mover is not the successful bidder for the equity of the Reorganized Debtor then this claim shall not be transferred or assigned to Class 6.<br><br>See also applicable provisions of Class 6 and Article II.D.3 below for more information with respect to the Class 1 Claim.<br><br>The treatment of the Class 1 Claim described herein shall be in full settlement and satisfaction of the secured claim against the Debtor. |
| 2 | **Claimant:** James D'Addario ("JD")<br><br>**Proof of Claim Amount:** $290,833.00 (Claim No. 9) | N | Impaired; allowed claim in this class is entitled to vote on the Plan. | **Summary of Treatment:**<br><br>The plan deems the JD Claim Amount allowed as an Allowed Secured Claim secured by the existing third-position lien. The Allowed Secured Claim will |

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| | **Class 2 Plan Treatment:** Allowed Secured Claim of $250,000 (the "JD Claim Amount") | | | accrue 9% interest, will be paid interest only for seven years, and will the balance of principal and interest will be paid fully amortized over the subsequent five years.<br><br>This is a summary only. The treatment of the JD Claim Amount is set forth in the attached **Exhibit    A    ,** *Settlement Agreement Among Swing House Rehearsal and Recording, Inc., D'Addario & Col., Jonathan Mover, and James    D'Addario* (the <u>"D'Addario    Settlement Agreement"</u>). The D'Addario Settlement    Agreement controls over any inconsistent statement in this summary. |
| 3 | **Claimant:** D'Addario & Company, Inc. ("D&Co")<br><br>**Proof of Claim Amount:** $1,043,842.00 (Claim No. 10)<br><br>**Class 3 Plan Treatment:** Allowed Secured Claim of $500,000 and Allowed Secured Claim of $150,000 (collectively, the "D&Co Claim Amount") | N | Impaired; allowed claim in this class is entitled to vote on the Plan. | **Summary of Treatment:**<br><br>The plan deems the D&Co Claim Amount allowed as an Allowed Secured Claim secured by the existing first-position and fourth-position liens. The $500,000 Allowed Secured Claim secured by the existing first-position lien will accrue 9% interest and principal and interest will be paid fully amortized over seven years. The    $150,000    Allowed Secured Claim secured by the existing fourth-position lien will accrue 9% interest, will be paid interest only for seven years, and the balance of principal and interest will be paid fully amortized over the subsequent five years.<br><br>This is a summary only. The treatment of the D&Co Claim Amount is set forth in the attached **Exhibit [A] to the Plan,** the    D'Addario Settlement Agreement. The |

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|---------------|----------------|-----------|
|         |             |               |                | Settlement Agreement controls over any inconsistent statement in this summary. |

## 2. Classes of Priority Unsecured Claims

Certain priority claims that are referred to in Bankruptcy Code § 507(a)(3), (4), (5), (6), and (7) are required to be placed in classes. These types of claims are entitled to priority treatment as follows: the Bankruptcy Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of the claim. However, a class of unsecured priority claim holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of the claim.

The following chart sets forth the description and treatment of each of the Debtor's priority unsecured claims:

| CLASS # | DESCRIPTION | INSIDER (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|---------------|----------------|-----------|
| 4 | **Claimant:** Philip Jaurigui ("PJ")  **Claim Amount:** $6,270.00 (Scheduled) | Y | Unimpaired; allowed claim in this class is not entitled to vote on the Plan. | Allowed priority unsecured claim of PJ to be satisfied and paid in full on the Effective Date in full and complete satisfaction of all PJ's priority unsecured claims herein. |

## 3. Classes of General Unsecured Claims

General unsecured claims are unsecured claims not entitled to priority under Bankruptcy Code § 507(a).

The following chart identifies the Plan's treatment of the classes containing all of the Debtor's non-priority general unsecured claims:

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|----------------|-----------|
| 5 | All allowed general unsecured claims other than those allowed | Impaired; allowed claims in this class are | The Reorganized Debtor shall pay to Class 5 allowed claimholders, in the aggregate, the sum of $84,956, |

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| | general unsecured claims in Class 6 below. | entitled to vote on the Plan. | which will be distributed to all allowed Class 5 claimholders on a pro rata basis as follows:<br><br>Subject to provisions of Class 6 which are applicable to the Mover Class 5 Unsecured Claim (as defined therein), and starting on the third month after the Plan Effective Date, the Debtor shall make quarterly payments of $3,034.25 to all allowed Class 5 claimholders on a pro rata basis until the balance of $84,956 is paid in full. The Allowed Unsecured Claims will be paid over a seven year period with no additional interest.<br><br>The Debtor projects that payment to members of this class shall be approximately 10% of the allowed amount of their claims. However, without default under the Plan, members of this class may be paid more or less than 10% if an unsecured claim is less or greater than expected.<br><br>Unless applicable holder(s) of Class 5 Claims agree otherwise, there shall be no discount and no prepayment penalty for early payment of Class 5 Claims.<br><br>Subject to applicable provisions of Class 6, in regard to Mover's Class 5 Claim,, quarterly payments shall be due on the last day of each quarter. In accordance with Class 6, distributions on account of the Mover Class 5 Claim shall be made monthly, if and when this Claim is assigned to the Class 6 members, and shall be made quarterly upon reversion to Mover.<br><br>See also applicable provisions of Class 6 and Article II.D.3 below for more information with respect to Mover's Class 5 Claim.<br><br>The treatment of the Class 5 Claims described herein shall be in full |

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| | | | settlement and satisfaction of such unsecured claims against the Debtor. |
| 6 | All holders of allowed general unsecured litigation claims against the Debtor and who are compromising their claims against the Debtor (the "Litigation Claims Settlement"). | Impaired; allowed claims in this class are entitled to vote on the Plan. | In accordance with the terms and conditions of Article II.D.3 below, after confirmation of the Plan and promptly after the Effective Date, Class 6 members will dismiss all litigation claims and causes of action against the Debtor and Mover including, but not limited to, (i) claims and causes of action against the Debtor in Case No. BC 596875 (the "7175 WB Superior Court Action") and in 7175 WB's Proof of Claim No. 12-1 filed in the Debtor's Chapter 11 case ("7175 WB's Swing House Proof of Claim"); (ii) the contested motion pending in this Court with regard to Mover's Class 1 secured claim (the "Mover Contested Matter"); and (iii) any other claims and causes of action against the Debtor and Mover arising from the Debtor's bankruptcy; provided, however, that the Class 6 members will expressly reserve all of their rights, and will not dismiss, any litigation claims, or causes of action against Phil Jaurigui.<br><br>New Value Payment: After confirmation and on the Effective Date, members of Class 6 shall receive $75,000 of the New Value Contribution.<br><br>Plan Distributions: Members of Class 6 shall receive further distributions over 7 years from the Effective Date as follows:<br><br>Class 1 Payment (payable Years 1 – 7 in respect of the Mover Class 1 Claim, as defined herein below): $1,146.03/month<br><br>Class 5 Payment (payable Years 1 – 7 in respect of the Mover Class 5 Unsecured Claim, as defined herein below): $364.50/month |

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|----------------|-----------|
| | | | Base Payment (payable Years 1 – 7): $773.83/month

Incremental Payment (payable Years 2 – 6): $1,291.67/month.

Incremental Payment (payable Year 7): $895.67/month.

One-Time Annual Payment (payable Years 2 – 6): $9,000 – Due on or before December 31st of each year.

The aggregate amount of scheduled payments to members of Class 6 shall be $400,130 (the "Aggregate Class 6 Amount").

Except as provided for immediately hereinbelow, Class 6 payments shall be monthly, and shall be combined into a single check for convenience of the Debtor and members of Class 6.

Notwithstanding the Plan Distribution Schedule above, the following shall apply:

Sale of Stock or Change in Control: Mover shall retain 51% or more of the stock of the Reorganized Debtor until Class 6 is paid in full. Mover may transfer stock in the Debtor to entities in which he holds controlling interests and such transfers shall not constitute a change in control. Transfers of stock to Genoveva Winsen shall be permissible provided that Mover shall continue to maintain majority control of the Reorganized Debtor, directly or indirectly. At no time while monies are owed to Class 6 may Mover's equity share drop below 51%. In the event that Mover holds less than 51% of the stock or there is a change in control such that Mover no longer controls the Reorganized Debtor, then Class 6 may elect at its option to continue to receive the payments provided for in the Plan or it may elect to receive full payment of the |

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|----------------|-----------|
| | | | balance of its then Aggregate Class 6 Claim.<br><br>Sale of Assets:  Upon the sale of a majority of the assets of the Reorganized Debtor, the members of Class 6 may elect to be paid the balance of the Aggregate Class 6 Amount in the amount then owed.  A majority of the assets is defined by reference to the book value of the assets as shown on the Debtor's balance sheet.<br><br>Refinance of Reorganized Debtor's Obligations:  During such time as Class 6 is owed monies under the Plan, the Reorganized Debtor shall not refinance the debts of the Debtor so as to increase the amount of secured debt owed.<br><br>Notwithstanding the foregoing, the Debtor may increase secured debt to purchase additional (1) fixed assets, (2) intellectual property, and/or (3) real property.  Should the Debtor utilize financing to purchase any additional assets, then the Debtor may not grant a security interest in assets which, as of the Plan's Effective Date, are security for other obligations.<br><br>Equity Distributions:  There shall be no distributions to equity holders from funds from a loan.<br><br>The payments above shall first be made by the Debtor from distributions otherwise payable under this Plan to the holder of the Class 1 Secured Claim (the "Mover Class 1 Claim") and the Class 5 Claim currently held by Mover (the "Mover Class 5 Unsecured Claim").  To secure these payments for the benefit of Class 6 members, and on or before the Effective Date, Mover and the Class 6 members shall execute, exchange, and deliver such documents, instruments, agreements as shall be required to transfer or |

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
|  |  |  | assign to the Class 6 members all of Mover's secured and unsecured claims, including, but not limited to: (i) the Mover Class 1 Secured Claim; and (ii) the Mover Class 5 Unsecured Claim. If and to the extent that payments above to Class 6 members are not satisfied from distributions otherwise payable on account of the Mover Class 1 Claim and the Mover Class 5 Unsecured Claim, the Debtor shall make those payments from its own funds.<br><br>Upon payment of the Aggregate Class 6 Amount, the Mover Class 1 Secured Claim and the Mover Class 5 Unsecured Claim shall be automatically transferred or assigned back to Mover but the Debtor shall receive credit for deemed distributions on account of the Mover Class 1 Claim and the Mover Class 5 Unsecured Claim to the extent those claims would have been paid in accordance with the schedule of the distributions on account of the Class 6 Claim.<br><br>On or before the Effective Date, Mover and the Class 6 members shall execute, exchange, and deliver such documents, instruments, agreements as shall be required to provide for such automatic transfer or assignment.<br><br>In the event that Mover is not the successful bidder for the equity of the Reorganized Debtor, or if otherwise elected by Mover or the members of Class 6, in accordance with Article II.D.3 below, then Mover's Class 1 Claim and Mover's Class 5 Claim shall not be transferred or assigned to Class 6, and payment of the Aggregate Class 6 Amount shall instead be made by the Reorganized Debtor.<br><br>On or before the Effective Date, and subject to the terms and conditions of Article II.D.3 below, members of |

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| | | | Class 6, Mover and the Debtor shall execute, exchange, and deliver such documents, instruments, and agreements as may be necessary to waive and release all claims against one another.<br><br>Unless the Class 6 members agree otherwise, there shall be no discount and no prepayment penalty for any early payment of any claims owed to or held by the members of Class 6. |
| 7 | All allowed general unsecured claims to the extent they include amounts that are not for pecuniary loss, including without limitation punitive or exemplary damages, penalties, and the portion of multiple damages other than the portion multiplied. | Impaired; deemed to have rejected the Plan | The holders of Class 7 claims shall not receive any distribution on account of their Class 7 claims. |

### 4.   Class of Interest Holders

Interest holders are the parties who hold an ownership interest (i.e., equity interest) in the Debtor.

The following chart identifies the Plan's treatment of the class of interest holders:

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 8 | All equity holders in the Debtor. | Impaired; deemed to have rejected the Plan | All existing equity interests in the Debtor shall be extinguished and Class 6 equity holders shall receive no distribution under the Plan. |

### D.   Means of Effectuating the Plan and Implementation of the Plan

### 1.   Funding for the Plan

In connection with Plan confirmation, Mover (the "Contributor") contributed the sum of $250,000.00 as a "new value" contribution to the Debtor (the "New Value Contribution"), which was deposited into Debtor's counsel's trust account before the initial Plan Confirmation hearing.

13

The New Value Contribution will be used to fund the Effective Date payments under the Plan and to fund the administrative expenses of the estate, as follows:

| | |
|---|---|
| Administrative Expenses | $577,948.51 |
| Priority Tax Claims | $     799.00 |
| Priority Unsecured Claims (Class 4) | $   6,270.00 |
| Settlement Payment to 7175 WB, LLC | $  75,000.00 |

Based on the deposit of the New Value Contribution before the Plan Confirmation hearing, anticipated working capital of the Debtor, and anticipated payment arrangements with certain parties above, the Proponent is confident that the Debtor will have sufficient cash on hand to make all required Effective Date payments.

After the Effective Date payments, payments under the Plan will be funded from the Reorganized Debtor's ongoing business operations.

### 2.    **Composition of the Reorganized Debtor**

In exchange for the New Value Contribution, to be funded on the Effective Date, the Contributor or the winning overbidder will receive 100% of the stock of the Reorganized Debtor on the Effective Date.

The Reorganized Debtor will continue to be incorporated under the laws of the State of California. On the Plan Effective Date, all of the existing equity interests in the Debtor are deemed cancelled and extinguished and of no force or effect. Existing equity holders in the Debtor do not receive any distribution or retain any property on account of their equity interests. On the Plan Effective Date, the Reorganized Debtor is owned solely by the Contributor. The Contributor is the sole shareholder of the Reorganized Debtor, and as such, acquires all rights to elect and appoint, as appropriate, directors of the Debtor, and to make such decisions regarding the business which require the consent of the shareholder under the Reorganized Debtor's by-laws, articles of incorporation, or pursuant to the laws of the state of its incorporation. Mover, the Debtor's current business and financial consultant, member of the board of directors, and minority shareholder, assumes the role of Chief Executive Officer and business manager, and manages the Debtor's ongoing day-to-day business operations.

Notwithstanding anything to the contrary in the Debtor's articles of incorporation or by-laws, this Plan amends the articles of incorporation of the Reorganized Debtor so as to prohibit the issuance of non-voting equity securities.

### 3.    Settlements

(a)    Litigation Claims Settlement

As a compromise under Fed. R. Bankr. P. 9019 and subject to and in consideration for the provisions of Class 6, the Debtor, Mover, and the members of Class 6 have agreed, as of the Effective Date (a) to release all known and unknown litigation claims among them relating to or arising from the bankruptcy of the Debtor, including litigation claims (i) between the Debtor and the members of Class 6, including the 7175 WB Superior Court Action and 7175 WB's Swing House Proof of Claim (but only litigation claims against the Debtor), (ii) between Mover and the members of Class 6, including the Mover Contested Matter, and (iii) between the Debtor and Mover, and (b) to execute, exchange, and deliver, on or before the Effective Date, documents, instruments, and agreements to evidence mutual releases of the aforesaid claims between the Debtor, Mover, and the members of Class 6, and (c) to provide for payments to Mover and to the members of Class 6, as otherwise set forth therein (the "Litigation Claims Settlement") .

The above-referenced allowance and treatment of claims in Classes 1, 5 and 6, in accordance with the Litigation Claims Settlement, and the rights and obligations accorded herein and elsewhere in this Plan on account of or relating to the Litigation Claims Settlement, constitute a compromise and settlement under Bankruptcy Rule 9019 by, between, and among the Debtor, Mover, and the members of Class 6 that fully resolve any and all legal, contractual, and equitable rights, claims, remedies, and disputes between and among the Debtor, Mover, and the members of Class 6 with regard to the claims set forth herein.

In the event that Mover is not the successful bidder for the equity in the Reorganized Debtor, then: (a) Mover will not assign his Class 1 and Class 5 claims to Class 6, in which event, the other provisions of Class 6 shall then apply thereto; (b) at the option of Mover or Class 6, the provisions of paragraphs (a) and (b) of the Litigation Claims Settlement shall not take place; and/or (c) Mover and Class 6 shall reserve and retain any and all of their other rights. In any such

event, all other provisions of this Plan shall remain in full force and effect. Nothing herein shall be deemed to release any right or claim of any party to the Litigation Claims Settlement against any person or entity not a party thereto.

The parties to this Litigation Claims Settlement have negotiated the terms of this Litigation Claims Settlement in good faith, and hereby agree that they will take all steps necessary and reasonable to seek approval of this Litigation Claims Settlement and its terms as agreed to by the parties.

(c)    Potential Insurance Claims

The Debtor has provided to 7175 certain insurance policies which insured the Debtor's prior business location and which 7175 owned. 7175 has asserted that the Debtor damaged the prior business location and that such losses may be insured by these policies. The Plan Proponent expresses no opinion whether 7175 is correct. Following confirmation, the Debtor will, in its discretion, seek a review of the policy by qualified counsel and, if appropriate, either on its own or in a joint action with 7175, seek recoveries from these policies. The Debtor and 7175 may enter into any agreement which the Debtor deems reasonable concerning the disposition of any proceeds from these insurance policies.

**4.    Post-Confirmation Management**

As of the date the Court confirms the Plan in open Court, Mover will assume the role of Chief Executive Officer and business manager. Mover will be in charge of the Reorganized Debtor's day-to-day business operations. All other officers and all directors shall be deemed terminated as of the date the Court confirms the Plan in open Court.

As set forth in the D'Addario Settlement Agreement, Mover's compensation will be a base salary of no greater than $15,000 per month, subject to 5% annual increases. In any event, Mover's Consulting Agreement dated July 23, 2014 will terminate in accordance with Section 7 thereof upon the Effective Date of the Plan. Genoveva Winsen will assume the roles of Chief Financial Officer and Secretary. To the extent that any other person holds any position with the Debtor as an officer or director, such person's position shall be terminated effective upon the Effective Date.

Upon the Effective Date, the term of office of each existing director shall terminate. As the sole shareholder of the Reorganized Debtor, the Contributor will have the right to nominate and elect the Board of Directors of the Reorganized Debtor.

### 5.  **Disbursing Agent**

The Reorganized Debtor will serve as the disbursing agent for purposes of making all distributions required to be made under the Plan. The Reorganized Debtor may not charge any disbursing agent fee for making the distributions.

### 6.  **Objections to Claims**

Except as set forth immediately below, the Debtor or the Reorganized Debtor, as the case may be, will file objections to all claims which are inconsistent with the Debtor's books and records unless the Debtor deems the inconsistency to be insignificant. With respect to disputed claims which are not resolved before the Plan Effective Date, the Reorganized Debtor will have the authority, in its sole discretion, in the reasonable exercise of its business judgment, to settle or compromise any disputed claim without further notice or court approval. As provided by § 502(c) of the Bankruptcy Code, the Court may estimate any contingent or unliquidated disputed claim for purposes of confirmation of the Plan. The Debtor or the Reorganized Debtor, as the case may be, will have the authority to file any objections to claims following the confirmation of the Plan, and the Court retains jurisdiction over the Debtor, the Reorganized Debtor, and this case to resolve objections to claims following the confirmation of the Plan. If the Reorganized Debtor determines it appropriate to do so, the Reorganized Debtor as the Disbursing Agent is authorized to make estimated distributions to holders of Class 5 allowed claims before all disputed Class 5 claims have been resolved to final order, and must establish an appropriate reserve to deal with payment to holders of disputed Class 5 claims who ultimately obtain Class 5 allowed claims. Nothing contained in the Plan constitutes a waiver or release by the Debtor or the Reorganized Debtor of any rights of setoff or recoupment, or of any defense, the Debtor or the Reorganized Debtor may have with respect to any claim.

17

7.    **Avoidance and Non-Avoidance Actions**

Except as is discussed below in this section, the Debtor is not aware of any payments made during the ninety-day preference period for non-insiders or the one-year period for insiders which would be clearly avoidable as preference payments, as the Debtor believes that all such payments would be subject to some form of ordinary course, contemporaneous exchange, or new value defense. A copy of the schedule of the Debtor's payments made during the ninety-day preference period for non-insiders and the one-year period for insiders is attached to the Disclosure Statement as **Exhibit 2**. The Debtor also believes that the detriment to the Debtor's business from suing vendors would outweigh any benefit from the pursuit of preference actions.

Except as discussed below, the Debtor is also not aware of any fraudulent conveyances which have occurred and which need to be avoided. Nevertheless, on the Plan Effective Date the power and standing of this estate to pursue avoidance causes of action are transferred to and retained by the Reorganized Debtor pursuant to § 1123(b) of the Bankruptcy Code. Any professional fees and expenses incurred in the pursuit of avoidance causes of action may be paid solely from the recovery from the pursuit of such avoidance causes of action. Any net recovery from the avoidance actions must be paid on a pro-rated basis to holders of Class 5 Claims in addition to the other payments provided for in the Plan.

All claims, causes of action, and avoidance actions of the Debtor and the Debtor's estate are preserved by the Plan, and the Reorganized Debtor has full power and authority to settle, adjust, retain, enforce, or abandon any claim, cause of action or avoidance actions under § 1123(b) of the Bankruptcy Code or otherwise, regardless of whether the claims, causes of action, or avoidance actions were commenced prior or subsequent to the Plan Effective Date. A copy of the non-exhaustive list of non-avoidance claims is attached to the Disclosure Statement as **Exhibit 3**. Any net recovery from the non-avoidance actions remains the property of the Reorganized Debtor.

While conducting due diligence and while initially assisting the Debtor to manage its business and then as a co-manager of the business, the Proponent has discovered what he believes have been improper acts (both prior to and during the chapter 11 case) by officers and

18

directors of the Debtor and/or their agents. These acts include, but are not limited to, diverting corporate opportunities away from the Debtor, declining to bring business to the Debtor, taking steps to slow down the flow of business to the Debtor, diverting corporate assets including the right to receive monies, causing the Debtor to be liable for taxes for income the Debtor did not receive and for breaching fiduciary duties. In particular, the Debtor appears to hold various legal rights to, and in connection with, two artists, Jared James Nichols and The Tender Box, but those rights and the monies which flow from those rights appear to have been diverted from the Debtor.

Post-confirmation, the Reorganized Debtor will investigate these alleged acts and, as appropriate, bring legal action against persons the Reorganized Debtor identifies as liable for the acts identified above in this paragraph. The Plan Proponent expresses no opinion concerning any likely recoveries. The Debtor retains the power to bring these actions.

**8.      Employment of Officers, Employees, and Professionals**

Notwithstanding any provision herein to the contrary, on and after the Plan Effective Date, the Reorganized Debtor will have the right to employ and compensate such officers, employees, professionals, agents, and representatives as the Reorganized Debtor determines is necessary or appropriate to implement all of the provisions of the Plan. The payment of all fees and expenses of the professionals engaged by the Reorganized Debtor and any other expenses of the Reorganized Debtor will be the responsibility of the Reorganized Debtor.

**9.      Exemption from Transfer Taxes**

Pursuant to § 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under § 1129 of the Bankruptcy Code, may not be taxed under any law imposing a stamp tax or similar tax.

**10.     Employment of Professionals by the Reorganized Debtor and Payment of Professional Fees and Expenses Incurred after the Plan Effective Date**

The Reorganized Debtor will have the authority to employ professionals as the Reorganized Debtor deems appropriate and to pay the fees and expenses incurred by the professionals without any further order of the Court.

## 11.    Distributions to be Made Pursuant to the Plan

Except as otherwise agreed to by the Reorganized Debtor in writing, distributions to be made to holders of allowed claims pursuant to the Plan may be delivered by regular mail, postage prepaid, to the address shown in the Debtor's schedules, as they may from time to time be amended in accordance with Bankruptcy Rule 1000, or, if a different address is stated in a proof of claim duly filed with the Bankruptcy Court, to that address. Checks issued to pay allowed claims are null and void if not negotiated within sixty (60) days after the date of issuance thereof.

## 12.    Injunctions

The Plan Confirmation Order enjoins the prosecution, whether directly, derivatively or otherwise, of any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, liability or interest released, discharged, or terminated pursuant to the Plan. Except as provided in the Plan or the Plan Confirmation Order, as of the Effective Date, all entities that have held, currently hold or may hold a claim or other debt or liability that is discharged or an interest or other right of an equity security holder that is extinguished pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtor, the Reorganized Debtor, or the Debtor's and Reorganized Debtor's property on account of any such discharged claims, debts, or liabilities or extinguished interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien or encumbrance; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtor or Reorganized Debtor; and (v) commencing or continuing any action in any manner, in any place, that does not comply with or is inconsistent with the provisions of the Plan. By accepting distribution pursuant to the Plan, each holder of an allowed claim receiving distributions pursuant to the Plan is deemed to have specifically consented to the injunctions set forth in this Section.

**13.    Executory Contracts and Unexpired Leases**

To the best of the Debtor's knowledge, the Debtor has an interest in one unexpired lease, pertaining to the Debtor's business premises at 3229 Casitas Ave, Los Angeles, CA 90039 (the "Building Lease").  On the Plan Effective Date, the Business Lease is assumed and deemed assumed to the extent not already assumed.  No cure payments are required in connection with any assumption of the Building Lease under the Plan.

Notwithstanding the terms of the D'Addario Settlement Agreement, on the Effective Date the Debtor shall assume and assign the *Consulting Agreement* dated July 7, 2014, as amended May 10, 2016, between the Debtor and D'Addario & Co., to Philip J. Jaurigui.  No cure payments are required in connection with the assumption or assignment of the Consulting Agreement under the Plan.

Notwithstanding the terms of the D'Addario Settlement Agreement, on the Effective Date the Debtor shall assume the *Site License Agreement* dated July 7, 2014, as amended May 10, 2016, between the Debtor and D'Addario & Co.  No cure payments are required in connection with the assumption of the Site License Agreement under the Plan.

On the Plan Effective Date, the Debtor shall assume  the following:  *Content Sales and SNOCAP Services Agreement* dated 2007 SNOCAP, Inc. and Swing House quality Records; letter agreement dated August 20, 2012 between Melillo Music and the Debtor; letter agreement dated May 1, 2013 between the Debtor, Warren Huart, and Jared James Nichols; *Master Recording Agreement* dated July 24, 2013 between The Extreme Music Library Limited, Jared James Nichols, and Swinghouse; *Agreement* dated August 10, 2014, between Laurent Merle and the Debtor; letter agreement dated October 21, 2014 between Remark Music Ltd., James Jared Nichols, and Swinghouse Productions; and *Deal Memo* dated December 6, 2014 between Warren Huart and Jared James Nichols (the "Other Assigned Agreements").  No cure payments are required in connection with the assumption of the Site License Agreement under the Plan.

On the Effective Date, the Debtor is deemed to have rejected any and all executory contracts or unexpired leases which may be in effect to the extent not already rejected, other than the Building Lease, the Consulting Agreement, the Site License Agreement, and those executory

contracts and unexpired leases listed on the **Exhibit 4** attached to the Disclosure Statement to the extent that they were executory contracts or unexpired leases on the Petition Date (the "Other Assumed Agreements").  No cure payment is required in connection with any assumption of the Other Assumed Agreements.  Rejection damages claims must be filed with 30 days after the Effective Date of the Plan or forever be barred.

The Confirmation Order, subject to the occurrence of the Effective Date, constitutes an Order approving the Debtor's assumption of the Building Lease, the Consulting Agreement, the Site License Agreement, and the Other Assumed Agreements to the extent not already assumedand determining that no cure payments are due or owing, and approving the rejection of all other executory contracts and unexpired leases.

### 14.   **Changes in Rates Subject to Regulatory Commission Approval**

The Debtor is not subject to governmental regulatory commission approval of its rates.

### 15.   **Default Provisions**

Except as provided herein or in the Confirmation Order, in the event that the Reorganized Debtor or the Disbursing Agent defaults in the performance of any of its obligations under the Plan and does not cure such a default within thirty days after receipt of written notice of default from the creditor to whom performance is due, then the entity or individual to whom the performance is due may pursue such remedies as are available at law or in equity.  An event of default occurring with respect to one claim is not an event of default with respect to any other claim.

### 16.   **Retention of Jurisdiction**

After confirmation of the Plan and occurrence of the Plan Effective Date, in addition to jurisdiction which exists in any other court, the Court will retain such jurisdiction for the following purposes:

i.    To determine the allowability, classification, or priority of claims and interests upon objection by the Debtor or Reorganized Debtor whether the objection is filed before or after the Plan Effective Date;

22

ii.      To determine the extent, validity, and priority of any lien asserted against property of the Debtor, or property of the Debtor's estate;

iii.     To construe and take any action to enforce the Plan, the Plan Confirmation Order, and any other order of the Court, issue such orders as may be necessary for the implementation, execution, performance, and consummation of the Plan, the Plan Confirmation Order, and all matters referred to in the Plan and Plan Confirmation Order, and to determine all matters that may be pending before the Court in this case on or before the Plan Effective Date with respect to any person or entity related thereto;

iv.     To determine (to the extent necessary) any and all applications for allowance of compensation and reimbursement of expenses of professionals for the period on or before the Plan Effective Date;

v.      To determine any request for payment of administrative expenses;

vi.     To determine motions for the rejection, assumption, or assignment of executory contracts or unexpired leases filed before the Plan Effective Date and the allowance of any cure, rejection, and other claims resulting therefrom;

vii.    To determine all applications, motions, adversary proceedings, contested matters, and any other litigated matters instituted during the pendency of this case whether before, on, or after the Plan Effective Date including avoidance causes of action, and the Debtor has the right to commence any avoidance causes of action after the Plan Effective Date and to continue with the prosecution of any avoidance causes of action;

viii.   To determine such other matters and for such other purposes as may be provided in the Plan Confirmation Order;

ix.     To modify the Plan under § 1127 of the Bankruptcy Code in order to remedy any apparent defect or omission in the Plan or to reconcile any inconsistency in the Plan so as to carry out its intent and purpose;

x.      Except as otherwise provided in the Plan and Plan Confirmation Order, to issue injunctions, to take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or the Plan Confirmation

Order, or the execution or implementation by any person or entity of the Plan or the Plan Confirmation Order;

xi. To issue such orders in aid of consummation of the Plan or Plan Confirmation Order, notwithstanding any otherwise applicable nonbankruptcy law, with respect to any person or entity; and

xii.    To enter a final decree closing this Chapter 11 case.

**17.**    Turnover of Estate Assets to the Debtor and Reorganized Debtor

Within 24 hours of the date and time the Court confirms this Plan in open Court or within 24 hours of the date of entry of an order confirming this Plan, whichever comes first, Philip Jauragui, the Debtor's present president, shall turnover to the Debtor all of the Debtor's property, including computers, telephones, information and documents in his active or constructive possession including the MacBook he uses, the electronic phone he uses and all information contained in both the MacBook and the electronic phone, all without deleting files and in unmodified condition.

Jaurigui shall cooperate with the Debtor's personnel to ensure an uninterrupted transition in ownership and management of the Reorganized Debtor, including, but not limited to, turning over all property, documents, records, accounts, keys, passwords, customer lists, etc. to the Debtor. Jaurigui shall immediately surrender all personal property belonging to the Debtor including all electronic hardware and software, any electronic devices owned by the Debtor and/or paid for by the Debtor (including the MacBook and electronic phone which he uses), all without files deleted and in unmodified condition.

Immediately, upon confirmation of the Plan in open Court or within 24 hours of the entry of an order confirming this Plan, Philip Jaurigui shall inform all banks where the Debtor maintains accounts (collectively, the "Banks") that he is not authorized by the Debtor (1) to sign any checks, (2) to draw monies from these accounts, to transfer monies from these accounts or to access these accounts for any purpose. If the Debtor determines that Philip Jarigui fails to inform any Bank of the foregoing, the Debtor shall be authorized to show any order approving confirmation of this Plan in order to cause such Bank to comply with the foregoing.

24

Philip Jaurigui shall return all property belonging to the Debtor and in his possession including but not limited to:  (1) keys to all of Debtor's buildings, access cards, files, and all documents related to tenants; (2) employee contact information and other information regarding employment with the Company; (3) all Company-related files, documents, and information, including all confidential information; whether maintained electronically or on paper; (4) all computers, computer hardware and software and other technology provided to Jaurgigui including the MacBook laptop and iPhone (with no files deleted and in unmodified condition).  Jaurigui must immediately turn them over the Company in an unmodified and un-erased condition for data to be copied and backed up along with any necessary passwords to access company files and programs.

**18.**    Final Accounting.

The Debtor shall prepare a final accounting for the bankruptcy estate on a cut-off basis for the period January 1, 2018 through the plan confirmation date to provide for appropriate allocation of income and expenses for the period January 1, 2018 through plan confirmation.

## III.    EFFECT OF CONFIRMATION OF THE PLAN

### A.    Discharge

On the Plan Effective Date, the Debtor will receive a discharge under the Plan pursuant to and in accordance with the provisions of § 1141 of the Bankruptcy Code because there has not been a liquidation of all or substantially all of the property of the Debtor's estate and because the Reorganized Debtor will be continuing with the Debtor's current business operations.

### B.    Modification of the Plan

Except as otherwise provided in Article II.D.3, the Co-Proponents may jointly modify the Plan at any time before confirmation.  The Court may require a new disclosure statement and/or re-voting on the Plan if the Co-Proponents jointly modify the Plan before confirmation.  Except as aforesaid, the Co-Proponents may also seek to jointly modify the Plan at any time after confirmation of the Plan so long as (1) the Plan has not been substantially consummated, and (2) the Court authorizes the proposed modifications after notice and a hearing.

### C.    Post-Confirmation Status Reports

As described above, until a final decree closing the Debtor's chapter 11 case is entered, the Reorganized Debtor must file a quarterly status report with the Court explaining what

progress has been made toward consummation of the confirmed Plan or closing of the case. The quarterly status report must also be served on the OUST and any party who files a Request for Special Notice after the Plan Effective Date.

**D.    Post-Confirmation Conversion/Dismissal**

A creditor or any other party in interest may bring a motion to convert or dismiss the case under § 1112(b) of the Bankruptcy Code after the Plan is confirmed if there is a default in performing the Plan that has not been timely cured. If the Court orders the case converted to Chapter 7 after the Plan is confirmed, then none of the property that has been dealt with by the Plan will become property of the Chapter 7 estate, and to the extent any property becomes property of the Chapter 7 estate, the automatic stay will be reimposed upon the revested property, but only to the extent that relief from stay was not previously authorized by the Court during this case. The Plan Confirmation Order may also be revoked under very limited circumstances. The Court may revoke the Plan Confirmation Order if it was procured by fraud and if a party in interest brings an adversary proceeding to revoke confirmation within 180 days after the entry of the Plan Confirmation Order.

**E.    Final Decree**

///

///

///

///

///

///

///

///

///

///

///

Once this estate has been substantially administered as referred to in Bankruptcy Rule 3022, the Reorganized Debtor must file a motion with the Court to obtain a final decree to close this case. The Reorganized Debtor is responsible for the timely payment of all fees incurred pursuant to 28 U.S.C. § 1930(a)(6).

Dated: April __, 2018

_____
JONATHAN MOVER
Plan Proponent

Presented By:

THE FOX LAW CORPORATION

By: _____
    STEVEN R. FOX
Attorney for Jonathan Mover, Plan Proponent

27

Once this estate has been substantially administered as referred to in Bankruptcy Rule 3022, the Reorganized Debtor must file a motion with the Court to obtain a final decree to close this case.  The Reorganized Debtor is responsible for the timely payment of all fees incurred pursuant to 28 U.S.C. § 1930(a)(6).


Dated:  April 16 2018

JONATHAN MOVER
Plan Proponent



Presented By:


THE FOX LAW CORPORATION

By:                                          4/16/18
     STEVEN R. FOX
Attorney for Jonathan Mover, Plan Proponent

27

In re
**Swing House Rehearsal And Recording, Inc.**           Chapter 11
**Philip Joseph Jaurigui**                               Case No.: 2:16-bk-24758-RK
                                                         Case No.: 2:16-bk-24760-RK
                              **Debtor(s)**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: **17835 Ventura Blvd., Suite 306, Encino, CA 91316**

A true and correct copy of the foregoing document entitled ***Fourth Amended Chapter 11 Plan Of Reorganization Dated April 16, 2018***
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On ***April 16, 2018***, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

**Counsel for Creditor Jonathan Mover:** Steven R Fox emails@foxlaw.com, **Counsel for 7175 WB, LLC:** Michael D Good mgood@southbaylawfirm.com, **Unknown:** Robbin L Itkin robbin.itkin@dlapiper.com, cheryleigh.bullock@dlapiper.com, **Counsel for Debtor:** Jeffrey S Kwong jsk@lnbyb.com, jsk@ecf.inforuptcy.com, **Unknown:** Richard J Laski (TR) rlaski@wilshirellc.com, **Unknown:** David W. Meadows david@davidwmeadowslaw.com, **Counsel for Hyundai Lease Titling Trust:** Austin P Nagel melissa@apnagellaw.com, **Counsel for Philip Jaurigui:** Leonard Pena lpena@penalaw.com, penasomaecf@gmail.com, **Debtor's Counsel:** Kurt Ramlo kr@lnbyb.com, kr@ecf.inforuptcy.com, **Unknown:** Justin E Rawlins jrawlins@winston.com, docketla@winston.com, **On behalf of West Casitas, LLC:** Derrick Talerico dtalerico@ztlegal.com, maraki@ztlegal.com, **Trustee:** United States Trustee (LA) ustpregion16.la.ecf@usdoj.gov, **On behalf of D'Addario & Company, Inc. And James D'Addario:** Rolf S Woolner rwoolner@winston.com, DocketSF@winston.com;pacercourtfile@winston.com, **On behalf of U.S. Trustee:** Hatty K Yip hatty.yip@usdoj.gov

☐  Service information continued on attached page

~~2.  SERVED BY UNITED STATES MAIL:~~
~~On~~ ***April 16, 2018***~~, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.~~

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, ~~OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL~~** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **April 16, 2018**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Honorable Robert Kwan, U.S. Bankruptcy Court, 255 E. Temple St., Courtroom 1675, Los Angeles, CA 90012

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 16, 2018  Sandy Cuevas | | |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

# Exhibit "A"

*Execution Version*

## Settlement Agreement Among Swing House Rehearsal
## and Recording, Inc., D'Addario & Co., Jonathan
## Mover, and James D'Addario

This Settlement Agreement ("Agreement") is entered into by and among Swing House Rehearsal and Recording, Inc., D'Addario & Co., Inc., Jonathan Mover, and James D'Addario (collectively the "Parties").

I.    **The Parties**

   a.  The Debtor and Debtor-in-Possession is Swing House Rehearsal and Recording, Inc. (the "Debtor")

   b.  D'Addario & Company, Inc. ("D'Addario & Co."), is a corporation organized under the laws of the State of New York.  It holds a 1st position lien secured by assets of the Debtor. It also holds at least a 4th position lien secured by assets of the Debtor.

   c.  Jonathan Mover ("Mover"), an individual, holds a 2nd position lien secured by assets of the Debtor.

   d.  James D'Addario, an individual, holds at least a 3rd position lien secured by assets of the Debtor.  James D'Addario and D'Addario & Co. shall be collectively known as the "D'Addarios".

II.   **Background Facts**

   a.  D'Addario & Co., the Debtor and Philip Jaurigui ("Jaurigui"), the principal shareholder and the President of the Debtor, at multiple times prepetition, entered into Convertible Secured Promissory Notes under which D'Addario & Co. loaned monies to the Debtor and the Debtor and Jaurigui agreed to repay the monies loaned, with interest thereon.

   b.  James D'Addario and the Debtor, prepetition, entered into a Convertible Secured Promissory Note by which James D'Addario loaned monies to the Debtor and the Debtor and Jaurigui agreed to repay the monies loaned, with interest thereon.

   c.  The D'Addarios assert they are owed the collective sum of approximately $1.4 million.  The Debtor disputes this figure based on offsets and credits the Debtor believes will reduce the balance owed to the D'Addarios.

   d.  The Parties agree that the secured claims asserted by the D'Addarios and Mover are secured by assets of the Debtor and that their liens are properly perfected and valid.

1

   e. The Debtor is the tenant for the lease of space located at 3229 Casita Avenue, Los Angeles, CA 90039. The lease will expire on its own terms on or about February 17, 2024 and the lease provides the Debtor with one option to extend the lease for 3-years. This lease shall be referred to as the "current lease".

   f. On November 8, 2016, the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the U.S. Code. Since said date, it has been, and continues to be, a debtor-in-possession.

   g. During the course of the chapter 11 case, the Debtor has proposed an original chapter 11 plan and subsequent amended plans (with the version eventually confirmed by the bankruptcy court defined herein as the "Plan"). The original and amended plans provided for various treatments of the D'Addarios' claims.

   h. Each of the D'Addarios voted to reject one of the amended plans.

   i. The Parties met on two occasions to negotiate a resolution of their differences.

The Parties signing this Agreement attest to the accuracy and correctness of the statements made above. Each party here is relying on the accuracy and correctness of the statements made above as a material inducement to entering into this Agreement.

## III.  **The Agreement**

Based on the foregoing and for other good and valuable consideration, the Parties enter into the following agreement.

   a. Approval of Agreement. The Agreement is subject to the approval of the Bankruptcy Court overseeing the Debtor's bankruptcy case.

   b. Binding Nature of Agreement. The Agreement will not be binding on the Parties signing the Agreement until the Court approves the Agreement. The Parties intend to secure the Court's approval through the Plan, which the Debtor will file. The Debtor and Mover shall use their best efforts to gain confirmation of the Plan and seek approval of the settlement set forth in this Agreement.

   c. Reduction of Principal Owed to the D'Addarios. The Debtor, Mover and the D'Addarios stipulate and agree that the aggregate principal balance of all loans owed to the D'Addarios is $1,400,000. In an effort to reach an agreement, the D'Addarios have agreed to reduce the aggregate principal

2

balance of $1.4 million by $500,000, to a new principal sum of $900,000 as of the Effective Date (defined below).

d. <u>Repayment Terms</u>.  The D'Addario loans shall be recast into three amended and restated loans (the "Amended Loans") secured by existing liens, which Amended Loans shall be evidenced by three notes which reflect the terms set forth below.  The loans held by D'Addario & Co. shall continue to be, and the loan held by James D'Addario shall be, evidenced and governed by the form of the prepetition promissory note dated July 7, 2014 given by the Debtor to D'Addario & Co., except as modified in this Agreement including without limitation with respect to interest (Section 1), the first three sentences on repayment of principal and interest (Section 2), prepayment (Section 4), conversion (Sections 3, 4, 9.1 second sentence, and 9.11), remedies in Sections 5.1(c)(ii)-(iii), (f)-(j), the first sentence of and reference to Jaurigui in Section 6, the covenants in Section 8, and the provisions in the second sentence of Section 9.6 and the entirety of Section 9.9.  Those loans shall be treated under this Agreement as follows:

· The First Amended Loan held by D'Addario & Co., secured by the existing 1st position lien in the Debtor's assets, shall be in the principal sum of $500,000, with interest accruing at 9%, amortized over 7 years, with equal payments of $8,045 (inclusive of principal and interest) paid monthly, starting 30 days after the Effective Date and on the same day of each month thereafter and the remaining principal balance, if any, due and payable in full on the seventh anniversary of the Effective Date.  The principal balance of the First Amended Loan shall be prepayable at any time without penalty.

· The secured loan by Mover, secured by the existing 2nd position lien in the Debtor's assets, shall be paid pursuant to the terms of the Debtor's Plan.

· The Second Amended Loan held by James D'Addario, in the principal amount of $250,000 and secured by the existing 3rd position lien in the Debtor's assets, and the Third Amended Loan held by D'Addario & Co., in the principal amount of $150,000 and secured by the existing 4th position lien in the Debtor's assets, with both the Second Amended Loan and the Third Amended Loan (collectively, the "Junior Amended Loans") accruing interest at 9%.  Cash payments in years 1 to 7 (following the Effective Date) shall be due starting 30 days after the Effective Date and on the same day of each month thereafter, consisting of interest only and shall be

3

*Execution Version*

calculated on each Junior Amended Loan's actual principal balance as of the payment due date. The principal balance of each Junior Amended Loan shall be prepayable at any time without penalty. Assuming the aggregate principal balance of the Junior Amended Loans remains $400,000 during years 1 to 7, then each monthly aggregate payment shall be $3,000. At the end of the seventh year, the Debtor shall commence making equal principal and interest payments such that Junior Amended Loans are fully paid off within 60 months following the seventh year. Assuming the aggregate principal balance of Junior Amended Loans at the end of year 7 is $400,000, then each monthly aggregate payment on the Junior Amended Loans shall be $8,303.

- For illustration purposes, a payment schedule which assumes no prepayments are made is set forth at Exhibit A hereto.

e.  <u>The Effective Date</u>.  This Agreement shall become effective (the "Effective Date") upon the effective date of the Plan.

f.  <u>Prepayment Obligations</u>.

Following the Effective Date and until the three loans held by the D'Addarios are paid in full, there shall be certain restrictions and obligations concerning the Debtor's operating cash, cash flow and equity distributions.

- The Debtor may retain $250,000 in operating cash with the dollar amount permitted to increase as the Debtor's gross revenue increases and would be equal up to 12% of gross revenue (of the prior year). Operating cash shall be defined as the first earned monies up to $250,000, subject to increase in accordance with the prior sentence.
- The Debtor may retain excess cash above operating cash in an amount equal to up to 25% of gross revenue (of the prior year) with a minimum excess cash amount of $500,000.
- All cash (1) exceeding the above amounts (operating cash and excess cash) and (2) following payment to the post-plan confirmation shareholder(s) of monies required to pay all federal and state income tax obligations incurred as a direct result of being shareholders of the post-confirmation Debtor, subject to the following provision, shall be paid as follows: (a) 50% to pay down the D'Addario loans and (b) 50% to make equity distributions to shareholders.
- The D'Addarios shall have consent rights to equity distributions, other than those equity distributions made to permit the shareholder(s) to pay federal

4

*Execution Version*

and state income tax obligations directly related to them being shareholders post-confirmation. Their consent to equity distributions shall not be unreasonably withheld.

g.  <u>Termination Events</u>.  Until Amended Loans are paid in full, all outstanding indebtedness owed by the Debtor to the D'Addarios shall be payable in full upon the occurrence of any of the following events, though the D'Addarios may waive this right:

- The sale of substantially all of the Debtor's assets.
- Mover no longer retains 51% or more of the stock of the Debtor, provided that Mover may transfer stock in the Debtor to entities in which he holds controlling interests and such transfers shall not constitute a change in control. Transfers of stock to Genoveva Winsen shall be permissible provided that Mover shall continue to maintain majority control of the Reorganized Debtor, directly or indirectly.
- The termination or expiration of the Debtor's current lease, excluding the exercise of any option to renew the current lease. However, if the current lease expires and the Debtor moves to a new leasehold, subject to the consent of the D'Addarios, which shall not be unreasonably withheld, then the termination or expiration of the current lease and shall not be a terminating event.

h.  <u>Reporting Requirements</u>.  The Debtor shall provide to the D'Addarios internal quarterly financial reports (balance sheet and income statement) and annual compiled financial reports. The annual financial statements shall include, but not be limited to, a balance sheet, an income statement and a statement of cash flows prepared in accordance with U.S. Generally Accepted Accounting Principles, consistently applied under the accrual method of accounting, provided however depreciation shall be calculated in accordance with the U.S. Internal Revenue Code in effect at such time. The Debtor's C.F.O. and C.P.A. shall cooperate with the D'Addarios regarding questions they may have about the financial reports.

i.  <u>Audit Rights</u>.  The D'Addarios shall be entitled to conduct an audit at their own cost and expense if any compiled statement show any of the following:

- Significant adjustment (which is defined as greater than or equal to 5% increase or decrease of any expense or revenue line item measured against prior year's financial statements);
- Any governmental action or inquiry; or

- Any threatened or pending litigation with a face payment demand of more than $25,000.

j.  <u>Springing Account</u>.  The Debtor shall establish, not later than the Effective Date, a bank account (the "Account") subject to a deposit account control agreement in favor of the D'Addarios.  The following conditions shall concern funding the maintenance of the Account and the D'Addarios' exercise of remedies with respect thereto.

- Ten (10) days following written notice by the D'Addarios to the Debtor of any monetary default by the Debtor under the Agreement and if such default is not cured within such ten (10) day period, then the D'Addarios shall be entitled to take control of the funds in the Account.

- Sixty (60) days following written notice by the D'Addarios to the Debtor of any non-monetary default by the Debtor under the Agreement and if such default is not cured (subject to the following sentence) within sixty (60) days, then the D'Addarios shall be entitled to take control of the Account. If the nature of the non-monetary default is such that it may be cured but more than sixty (60) days are reasonably required for its cure, then the Debtor shall not be deemed to be in default if the Debtor commences such cure within the sixty (60)-day period and thereafter diligently prosecutes the cure to completion in good faith, which completion shall occur not later than ninety (90) days from the date of such notice from the D'Addarios.

- On or before July 31, 2018, and notwithstanding the Effective Date, the Debtor shall deposit at least $15,000 into the Account.  On or before December 31, 2018, the Debtor shall have deposited in the Account at least $50,000.

- The Debtor shall thereafter maintain the Account balance at $50,000 at all times pending the payment of the Amended Loans in full.

k.  <u>Mover Compensation</u>.  Mover's compensation for work and for services shall be capped at $15,000 monthly as of the Effective Date.  Mover shall be entitled to annual raises of no more than 5%.  This compensation shall be separate from any equity distributions made in accordance with this Agreement.  To the extent the Debtor defers any or all of Mover's compensation, Mover's consent to such deferral does not waive his right to subsequently collect the deferred compensation as so agreed with the Debtor.

l.  <u>Remedies</u>.  After the occurrence of an event of default, subject to any applicable cure periods, the D'Addarios and Mover shall be entitled to

6

*Execution Version*

exercise all rights and remedies available to them under this Agreement, the Uniform Commercial Code, and, subject to the modifications under this Agreement, the prepetition loan documents.

m. <u>Debtor/D'Addario & Co. Agreements</u>. The following shall govern the treatment of certain other prepetition agreements between the Debtor and D'Addario & Co.

· <u>Trademark License Agreement dated July 7, 2014</u>. The Debtor shall reject the Trademark License Agreement in its plan to be filed. D'Addario & Co. agrees to waive all rejection damages related to the Trademark License Agreement. The Debtor and D'Addario agree that, upon the Effective Date, neither party shall have any continuing obligations under the Trademark License Agreement.

· <u>Site License, Consulting and Confidentiality Agreements</u>. D'Addario & Co. and the Debtor executed these agreements prepetition. These three agreements shall ride through confirmation without being assumed or rejected. The Parties shall renegotiate them in good faith.

n. <u>Plan Support and Voting</u>. Upon execution of this Agreement, the D'Addarios (1) shall be obligated to support confirmation of a plan filed by the Debtor which, subject to the D'Addarios' reasonable discretion, incorporates the provisions of this Agreement, (2) shall file a statement in writing to that effect and, (3) if the Court deems it necessary, shall cast ballots accepting the Plan or otherwise take whatever actions the Court might require to change the votes of the D'Addarios from rejecting to accepting.

## IV. Other Terms and Conditions.

a. <u>Inducement</u>. Except as specified here, no promise or inducement has been offered or made for this Agreement.

b. <u>Reliance</u>. No party here is relying on any statement or any representation not contained in this Agreement.

c. <u>Entire Agreement</u>. This Agreement reflects the entire agreement among the Parties.

d. <u>Binding Nature of Agreement</u>. The promises contained herein will be binding on the Parties, their representatives, successors and assigns of each of the Parties, and their attorneys.

e. <u>Advice of Counsel</u>. The Parties represent that in connection with the Agreement, they have had the advice of counsel, or have had the

7

*Execution Version*

opportunity to do so, and the Parties are aware of the effect, significance and consequence of this Agreement.

f.   <u>No Force, Duress or Undue Influence</u>.  The Parties are entering into this Agreement freely, without force, duress or undue influence.

g.   <u>Execution of Documents</u>.  Each party agrees to execute all such documents as may be reasonable, necessary, appropriate and/or helpful to carry out the provisions of this Agreement.

h.   <u>Enforcement and Attorneys' Fees</u>.  To provide for the enforcement of this Agreement, the Parties reserve to themselves the right to initiate and to pursue any legal action necessary to enforce the terms of this Agreement.  In the event of such legal action, the prevailing party shall be entitled to recover reasonable costs and reasonable attorney's fees incurred.

i.   <u>Notices</u>. Any notice required under this Agreement from one party to another shall be given by telecopier, electronic transmission, or by overnight mail to the Parties and to their counsel.  The Parties agree that service of any notice on the other party solely through its counsel shall not, on its own, create an obligation for counsel to forward the notice to the client.

j.   <u>Signatures</u>. This Agreement may be signed in separate counterparts by the Parties, each of which is an original, but all of which together shall be one document, including facsimile signatures, when one counterpart has been executed by each of the Parties.

k.   <u>Final Agreement</u>. This Agreement is the Parties' final, complete, exclusive and entire agreement.   It supersedes all prior or contemporaneous written or oral agreements by, between, and/or among them.  There are no representations, warranties, agreements, arrangements or understandings (oral or written), by, between and/or among the Parties, related to or connected with the subject matter contained in this agreement, other than those which are stated here.

l.   <u>No Admissions</u>.   The Agreement is an accord and satisfaction of a disputed matter.  No admission of liability is made by either party.

m.   <u>No Drafter's Presumption</u>. The Parties have cooperated and agreed on the Agreement's drafting and preparation.   If there is a dispute

8

37

*Execution Version*

concerning its terms, the Agreement shall be interpreted according to its plain and clear meaning and shall not be interpreted for or against any party on the ground that any such party drafted, or caused to be drafted, the Agreement or any part thereof.

n. <u>Disputes</u>. Any disputes, controversies or disagreements concerning the Agreement, its terms and conditions or any needed judicial interpretation thereof, shall be decided in the first instance by the United States Bankruptcy Court for the Central District of California and if that Court is not available to determine the dispute, then by the District Court for the Central District of California.

o. <u>Benefits of the Agreement</u>.  This Agreement is for the benefit of the Parties hereto, their present or future assignees and their successors.

p. <u>Interpretation</u>.  This Agreement shall be construed according to the laws of the State of California.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date indicated below.

SWING HOUSE REHEARSAL AND RECORDING, INC.

By Philip Jaurigui
Its President

D'ADDARIO & COMPANY, INC.

By: John D'Addario, III
Its: President

JONATHAN MOVER

JAMES D'ADDARIO

9

38

concerning its terms, the Agreement shall be interpreted according to its plain and clear meaning and shall not be interpreted for or against any party on the ground that any such party drafted, or caused to be drafted, the Agreement or any part thereof.

n.  <u>Disputes</u>. Any disputes, controversies or disagreements concerning the Agreement, its terms and conditions or any needed judicial interpretation thereof, shall be decided in the first instance by the United States Bankruptcy Court for the Central District of California and if that Court is not available to determine the dispute, then by the District Court for the Central District of California.

o.  <u>Benefits of the Agreement</u>.  This Agreement is for the benefit of the Parties hereto, their present or future assignees and their successors.

p.  <u>Interpretation</u>.  This Agreement shall be construed according to the laws of the State of California.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date indicated below.

SWING HOUSE REHEARSAL AND RECORDING, INC.

_____
By Philip Jaurigui
Its President


D'ADDARIO & COMPANY, INC.

_____
By:
Its:

_____
JONATHAN MOVER



_____
JAMES D'ADDARIO

9

39

*Execution Version*

**Approved as to form only:**

LEVENE, NEALE, BENDER, YOO & BRILL  L.L.P.

---

By:  Kurt Ramlo
Attorneys for Debtor-in-Possession

WINSTON & STRAWN

By: Gregory Gartland
Attorneys for D'Addario & Company, Inc.
and James D'Addario

THE FOX LAW CORPORATION

---

By Steven R. Fox
Attorney for Jonathan Mover

10

40

*Execution Version*

**Approved as to form only:**

LEVENE, NEALE, BENDER, YOO & BRILL  L.L.P.

_____

By:  Kurt Ramlo
Attorneys for Debtor-in-Possession


WINSTON & STRAWN

_____

By:  Gregory Gartland
Attorneys for D'Addario & Company, Inc.
and James D'Addario

THE FOX LAW CORPORATION                    3/7/18

By Steven R. Fox
Attorney for Jonathan Mover

10

41